ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| THE HORNED DORSET PRIMAVERA, INC. Y OTROS <br><br> Apelante <br><br><br> v. <br><br><br> HDP DEVELOPMENT, LLC Y OTROS <br><br> Apelada | KLAN202401016 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Aguada <br><br> Civil. Núm. AU2021CV00113 (SALÓN 0002 DISTRITO Y SUPERIOR) <br><br> Sobre: Incumplimiento de contrato y otros |

Panel integrado por su presidente, el Juez Candelaria Rosa, la Jueza Díaz Rivera y el Juez Sánchez Báez[2]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de septiembre de 2025.

Comparecieron The Horned Dorset Primavera, Inc. (en adelante, "Horned Dorset"), Wilhelm Sack (en adelante, "señor Sack") y Harold L. Davies (en adelante, "señor Davies") (en adelante y en conjunto, "apelantes") mediante el recurso de apelación presentado el 14 de noviembre de 2024. Nos solicitaron la revisión de la *Sentencia Sumaria* emitida por el Tribunal de Primera Instancia, Sala Superior de Aguada (en adelante, "foro primario").

Por los fundamentos que expondremos a continuación, se **confirma** la sentencia apelada.

**-I-**

El 8 de marzo de 2021, Horned Dorset presentó una *Demanda*[3] contra Lifeafar Holdings S. de R.L. (en adelante,

---

[1] Mediante la Orden Administrativa OATA-2025-013 emitida el 6 de febrero de 2025, se modificó la integración del Panel, debido al cese de funciones de la Hon. Camille Rivera Pérez.

[2] Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025, se designó al Juez Isaías Sánchez Báez en sustitución de la Jueza Grace M. Grana Martínez.

[3] Apéndice Suplementario del apelante, anejo XVI, págs. 294-337.

"Lifeafar"), HDP Development, LLC (en adelante, "HDP") y la Compañía de Turismo de Puerto Rico (en adelante, "Turismo"). En síntesis, instó tres (3) causas de acción, a saber: (1) el cumplimiento estricto del *Exclusive Right to Purchase Agreement*, es decir que, Lifeafar y HDP saldaran las reclamaciones contra Horned Dorset hasta un máximo de $1,000,000.00, y le pagaran a este último la cantidad de $800,000.00 para adquirir el usufructo, nombre y derechos operacionales del hotel; (2) sentencia declaratoria mediante la cual se resolviera que el *Release Agreement* produjo una novación extintiva respecto a las reclamaciones de Turismo contra Horned Dorsed; y (3) sentencia declaratoria sobre que el plazo acordado en el *Release Agreement* estaba vencido, por lo cual, Lifeafar y HDP debían pagar los impuestos acordados y Turismo debía aceptar y recibir dicho pago. No obstante, el 22 de noviembre de 2021, Horned Dorset presentó *Demanda Enmendada*.[4] En está, añadió una cuarta causa de acción sobre la indemnización por concepto de daños y perjuicios por una cantidad no menor de $2,000,000.00.

Por su parte, el señor Davies y el señor Sack presentaron mociones individuales a los efectos de incorporar las alegaciones y causas de acción de la *Demanda Enmendada* presentada por Horned Dorset.[5]

Luego, el 13 de junio de 2022, Turismo instó su contestación a las demandas presentadas por Horned Dorset, el señor Davies y el señor Sack.[6] En síntesis, alegó que Horned Dorset le debía no menos de $1,481,095.45 por conceptos de impuestos por ocupación de habitación de hotel que cobró y no remitió en violación a la Ley Núm.

---

[4] *Íd.,* anejo XVII, págs. 338-393.
[5] A pesar de que dichas mociones no fueron incluidas en el expediente ante nuestra consideración, nos percatamos de ellas y advinimos en conocimiento de su contenido mediante el Sistema Unificado de Manejo y Administración de Casos ("SUMAC"). Véase, SUMAC, entrada núm. 55 y 59.
[6] Apéndice Suplementario del apelante, anejos XVIII al XX, págs. 394-417.

272-2003, según enmendada, conocida como *Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico*, 13 LPRA sec. 2271 *et seq.,* (en adelante, "Ley Núm. 271-2003). Además, arguyo que el *Release Agreement* está sujeto a condiciones suspensivas que no han sucedido todavía y, por lo tanto, no ha ocurrido una novación extintiva de la deuda. Añadió que, las partes pactaron en el *Settlement Agreement* que Turismo tendría derecho a reclamar la deuda, siempre que no recibiera la totalidad del pago adeudado. Por último, sostuvo que no se ha negado en aceptar pago alguno.

Posteriormente, el 20 de junio de 2022, Lifeafar y HDP presentaron su *Contestación a Demanda Enmendada y Reconvención.*[7] Allí negaron responsabilidad y alegaron afirmativamente como sigue:

> [...] mediante el Contrato, Horned Dorset concedió a Lifeafar, por un periodo de tiempo limitado, el derecho exclusivo a realizar una debida investigación de los activos de Horned Dorset ("due diligence") y negociar con algunos acreedores de Horned Dorset para, de entenderlo prudente y a su discreción, negociar la consumación de la adquisición de la operación hotelera conforme a unos acuerdos a ser plasmados en un futuro contrato de compraventa. Se alega afirmativamente además que Lifeafar tenía la potestad de cancelar el Contrato en cualquier momento y no tenía, ni tuvo nunca, la obligación de adquirir los activos de Horned Dorset.[8]

Además, alegaron que Horned Dorsed incumplió con el *Exclusive Right to Purchase Agreement*, toda vez que cesó las operaciones del hotel, así como su mantenimiento y seguridad. Así pues, en la reconvención, solicitaron que se le ordenará a Horned Dorset a devolver el depósito pagado en virtud del *Exclusive Right to Purchase Agreement* y a reembolsar $120,000.00 en concepto de los gastos incurridos que pagaron a su nombre.

El 8 de julio de 2022, Horned Dorset, el señor Sack y el señor Davies, presentaron su *Contestación de los demandantes a la*

---

[7] *Íd.,* anejo XXI, págs. 418-427.
[8] *Íd.,* pág. 419.

*reconvención de Lifeafar y HDP*.[9] En síntesis, alegaron que el *Exclusive Right to Purchase Agreement* constituye un contrato de compraventa que cumple con todos los elementos jurídicos exigibles, excepto el pago de las prestaciones acordadas, a lo cual Lifeafar se niega ilícitamente.

Tras un extenso trámite procesal, el 31 de enero de 2024, Lifeafar y HDP presentaron *Moción de sentencia sumaria.*[10] En esta, alegaron que procedía la desestimación total de la demanda incoada en su contra. En cuanto a la primera y cuarta causa de acción, negaron que el *Exclusive Right to Purchase Agreement* los obligó a otorgar un contrato de compraventa, pero sostuvieron que aun cuando los hubiese obligado, este no procedía. Ello, en la medida que, el usufructo como objeto del contrato de compraventa se extinguió, a saber: (i) cuando Horned Dorset cesó de operar y mantener el hotel; y (ii) cuando se ejecutó la hipoteca sobre la nuda propiedad, la cual tenía un rango superior al usufructo. En cuanto a la segunda y tercera causa de acción, argumentaron que el *Release Agreement* no relevó a Horned Dorset del pago de impuestos por ocupación hotelera ni era exigible en derecho, ya que su cumplimiento estaba sujeto a una condición suspensiva que no ocurrió. Por último, sostuvo que Horned Dorset, debido a su incumplimiento, adeudaba las cantidades siguientes: (i) $80,000.00 por concepto de depósito; (ii) $255,779.00 en concepto de reembolso por los gastos incurridos en mantenimiento y otras partidas; y (iii) $160,000.00 en concepto de daños y perjuicios.

En igual fecha, 31 de enero de 2024, Turismo presentó Moción de *Sentencia Sumaria Parcial.*[11] Allí, solicitó la desestimación de la segunda y tercera causa de acción de la *Demanda Enmendada*

---

[9] *Íd.,* anejo XXII, págs. 428-432.
[10] Apéndice del apelante, anejo VI, págs. 35-78.
[11] *Íd.,* anejo VII, págs. 79-93.

incoado en su contra. Señaló que Turismo no forma parte del resto de las causas de acción, ya que son asuntos contractuales entre Lifeafar y HDP. Además, sostuvo que no procede declarar la existencia de una novación extintiva de la deuda de Horned Dorset con Turismo, toda vez que: (i) la vigencia del *Release Agreement* estaba sujeto a una condición suspensiva; (ii) la transferencia de operación del Hotel entre Horned Dorset y Lifeafar no ha sucedido; y (iii) Lifeafar no emitió ningún pago para saldar la deuda de Horned Dorset. También, sostuvo que Turismo no se ha negado a recibir algún pago y, por lo cual, argumentó que la tercera causa de acción es hipotética.

El 1 de marzo de 2024, Horned Dorset, el señor Sack y el señor Davies presentaron *Réplica y oposición de los demandantes a "Moción de sentencia sumaria parcial" de la Compañía de Turismo y solicitud de sentencia sumaria a favor de los demandantes.*[12] En esta, arguyeron que los planteamientos de Turismo son abstractos. Señalaron que las causas de acción presentada no pueden ser evaluadas de manera aislada. Aceptaron que la controversia del caso de epígrafe versa sobre dos contratos: (i) el *Exclusive Right to Purchase Agreement* suscrito por Lifeafar, HDP y Horned Dorset; y (ii) el *Release Agreement* pactado entre Turismo, Lifeafar y HDP.  Por lo cual, alegaron que la demanda enmendada es contra ambas empresas con el fin de obtener el cumplimiento de ambos contratos. Específicamente, en cuanto al *Release Agreement*, sostuvieron que allí se consignó que el pago de la cuantía transaccional se haría en tres plazos, de los cuales dos fueron cumplidos y solo resta el tercer y último pago. Razón por la cual, solicitaron que se ordenará a Turismo aceptar el mencionado pago. No obstante, alegaron que esa causa de acción no solo depende del cumplimiento de Turismo de

---

[12] *Íd.,* anejo IX, págs. 167-215.

aceptar el pago, sino también de que se obligue a Lifeafar efectuar tal pago. Por lo cual, argumentaron que no procede la desestimación de las causas de acción, debido a que tiene un entronque común con ambos contratos.

Asimismo, el 13 de marzo de 2024, Horned Dorset, el señor Sack y el señor Davies presentaron *Réplica y oposición de los demandantes a "Moción de sentencia sumaria" de Lifeafar y solicitud de sentencia sumaria a favor de los demandantes.*[13] Alegaron que, el caso de epígrafe no tiene una controversia sobre un contrato de usufructo ni sobre el rango que este deba tener en el Registro de la Propiedad, sino que trata sobre el incumplimiento del pago de una prestación acordada. Además, argumentaron que el *Exclusive Right to Purchase Agreement* es un contrato de compraventa dotado con los requisitos legales de consentimiento, objeto y causa consistente en la cifra de $1,800,000.00. Resaltaron que Lifeafar realizó una serie de actos conducentes a reconocer las obligaciones que contrajo bajo los términos de dicho contrato, entre ellas, tomó posesión y control de los activos de Horned Dorset. Por lo cual, sostuvieron que lo único queda pendiente para consumar el contrato es el pago de las prestaciones acordadas.

Así pues, el 23 de agosto de 2024, el foro primario emitió *Sentencia Sumaria Parcial*, notificada el 27 de agosto de 2024, mediante la cual declaró ha lugar la solicitud de sentencia sumaria presentada por Lifeafar, HDP y Turismo.[14] En consecuencia, desestimó todas las causas de acción presentadas por Horned Dorset contras estas últimas compañías. No obstante, ordenó la continuación de los procedimientos en cuanto a la reconvención presentada por Lifeafar y HDP. Por lo cual, el foro primario hizo una lista de 42 determinaciones de hechos materiales incontrovertibles

---

[13] *Íd.,* anejo VIII, págs. 94-166.
[14] *Íd.,* anejo XI, págs. 223-245.

y, de otro lado, hizo una lista de 6 determinaciones hechos controvertidos.

Inconforme, el 5 de septiembre de 2024, Horned Dorset, el señor Sack y el señor Davies presentaron *Solicitud de reconsideración y para que se hagan determinaciones de hechos y derecho adicionales.*[15]

En respuesta, el 18 de septiembre de 2024, Lifeafar y HDP presentaron su *Oposición a moción de reconsideración de la parte demandante en torno a sentencia sumaria parcial.*[16] Igualmente, el 25 de septiembre de 2024, Turismo presentó *Oposición a "Solicitud de reconsideración".*[17] Ambos, en síntesis, argumentaron que los planteamientos de la solicitud de reconsideración de Horned Dorset son repetitivos y no contiene un solo argumento que no haya sido considerado previamente por el foro primario.

Ante esto, el 16 de octubre de 2024, el foro primario emitió *Resolución,* notificada al día siguiente, mediante la cual denegó la solicitud de reconsideración y determinaciones de hechos adicionales.[18] Además, reiteró lo siguiente:

> [...] en el presente caso, quedó establecido que, conforme al *Exclusive Right to Purchase Agreement,* Horned Dorset concedió a Lifeafar el derecho exclusivo de comprar sus activos dentro del término de 75 días luego de firmado el contrato. En este sentido, es forzoso concluir que Lifeafar no estaba obligada a comprar, sino que podía o no ejercer su derecho exclusivo de comprar los activos de Horned Dorset. Sin embargo, las partes nunca suscribieron el *Purchase Agreement* que acordaron que formularían.
>
> Con relación al planteamiento de que el *Release Agreement* fue negociado en forma exclusiva entre Lifeafar y la Compañía, sin participación alguna de Horned Dorset ni de sus abogados, el Tribunal sostiene que independientemente de que el *Release Agreement* haya sido negociado entre Lifeafar y la Compañía, lo cierto es que Horned Dorset también lo suscribió.[19]

---

[15] *Íd.,* anejo XII, págs. 246-282.
[16] *Íd.,* anejo XIII, págs. 283-287.
[17] *Íd.,* anejo XIV, págs. 288-290.
[18] *Íd.,* anejo XV, págs. 291-293.
[19] *Íd.,* pág. 292 (énfasis en el original).

Aun inconforme, el 14 de noviembre de 2024, Horned Dorset, el señor Sack y el señor Davies acudieron ante nos mediante recurso de apelación y planteó la comisión de los errores siguientes:

**PRIMER ERROR:** COMETIÓ UN ERROR EL TPI AL RESOLVER QUE EL *EXCLUSIVE RIGHT TO PURCHASE AGREEMENT* CONSTITUYÓ UN CONTRATO DE OPCIÓN Y NO DE COMPRAVENTA, EN VIRTUD DEL CUAL LIFEAFAR NUNCA SE OBLIGÓ A ADQUIRIR LOS ACTIVOS DE HORNED DORSET, SIN TOMAR EN CUENTA LOS ACTOS Y REPRESENTACIONES DE LAS PARTES COETÁNEOS Y POSTERIORES AL OTORGAMIENTO.

**SEGUNDO ERROR:** ERRÓ EL TPI AL INTERPRETAR EL *RELEASE AGREEMENT* HACIENDO ABSTRACCIÓN DEL CONTRATO DE COMPRAVENTA Y AL APLICARLE A HORNED DORSET UNAS CLÁUSULAS SUSPENSIVAS CONTENIDAS EN EL TEXTO DEL MISMO, LAS CUALES HORNED DORSET NUNCA NEGOCIÓ Y NI SIQUIERA CONOCIÓ SINO HASTA 6 MESES DESPUÉS DE LA EFECTIVIDAD DE DICHO CONTRATO.

Luego de un trámite procesal, el 22 de enero de 2025, Lifeafar, HDP y Turismo instaron su *Alegato en oposición a apelación y solicitud de desestimación por incumplimiento reiterando con la Regla 16(E) del Reglamento del Tribunal de Apelaciones.* En igual fecha, Turismo presentó su alegato en oposición al recurso de epígrafe.

Con el beneficio de la comparecencia escrita de ambas partes, procedemos a exponer la normativa jurídica aplicable a la controversia ante nuestra consideración.

**-II-**

**A. Sentencia Sumaria**

La Regla 36 de las de Procedimiento Civil de Puerto Rico, 32 LPRA Ap. V, R. 36 instituye el mecanismo de sentencia sumaria a nuestro ordenamiento jurídico. En particular, su función es permitir que cualquiera de las partes pueda mostrar, previo al juicio, que no existe una controversia material de hecho que deba ser dirimida en un juicio plenario; y que, por tanto, el tribunal está en posición de aquilatar esa evidencia para disponer del caso ante sí. *Íd.*, R. 36.1-36.2; *Rodríguez Méndez v. Laser Eye,* 195 DPR 769, 784-785 (2016).

En ese sentido, la parte promovente de la solicitud debe demostrar la inexistencia de una controversia de hecho material por medio de una moción fundamentada, mientras que la parte promovida debe demostrar que existe controversia de algún hecho material sobre la totalidad o parte de la causa de acción. *Rodríguez Méndez v. Laser Eye,* supra, pág. 785. Además, la parte promovida no puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar evidencia que demuestre la existencia de controversia sustancial de hechos. *Íd.* Sin embargo, ninguna de las partes puede enmendar sus alegaciones a través de la presentación de una sentencia sumaria o su oposición. *León Torres v. Rivera Lebrón*, 204 DPR 20, 47 (2020).

Así pues, para que el tribunal pueda adjudicar en los méritos una controversia de forma sumaria, es necesario que, de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas y cualquier otra evidencia ofrecida, surja que no hay controversia real o sustancial en cuanto a algún hecho esencial y pertinente, y que, como cuestión de derecho, procede dictar sentencia sumaria a favor de la parte promovente. 32 LPRA Ap. V, R. 36.3(e).

Los hechos esenciales y pertinentes, también conocidos como hechos materiales, son aquellos que pueden afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Oriental Bank v. Caballero García*, 212 DPR 671, 679 (2023). Por lo tanto, el tribunal solo podrá dictar sentencia sumaria en los casos en los cuales tenga ante su consideración todos los hechos materiales para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. *Íd.*

Conviene destacar que el Tribunal Supremo ha dispuesto que el foro apelativo se encuentra en igual posición que el Tribunal de

Primera Instancia para evaluar la procedencia de una solicitud de sentencia sumaria. *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010, 1025 (2020). *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 115 (2015). Además, el Alto Foro estableció el estándar específico de revisión que debe utilizar el Tribunal de Apelaciones, a saber: (1) examinar de *novo* el expediente de la manera más favorable a favor de la parte promovida y aplicar las disposiciones de la Regla 36 de las de Procedimiento Civil, *supra* como su jurisprudencia interpretativa; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma instituidos en la Regla 36.4 de las de Procedimiento Civil, *supra;* (3) verificar si en realidad existen hechos materiales en controversia y, de haberlos, exponer concretamente los hechos materiales controvertidos e incontrovertidos, y (4) de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia. *Meléndez González et al. v. M. Cuebas,* supra, págs. 117-119. Además, el foro apelativo está limitado en su revisión a lo siguiente:

> *[P]rimero*, s[o]lo puede considerar los documentos que se presentaron ante el foro de primera instancia. Las partes no pueden añadir en apelación *exhibit*[s], deposiciones o affidávit[s] que no fueron presentados oportunamente en el foro de primera instancia, ni pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo. *Segundo*, el tribunal apelativo sólo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. No puede adjudicar los hechos materiales y esenciales en disputa. Esa tarea le corresponde al foro de primera instancia.

*Íd.*, pág. 114-115.

## B. Teoría general de contratos

El contrato nace a la vida jurídica cuando una o varias personas prestan su consentimiento para obligarse a hacer, dar o prestar algo. Artículo 1206 del Código Civil de 1930, 31 LPRA sec. 3371; *Unisys Puerto Rico, Inc. v. Ramallo Brothers,* 128 DPR 842, 852 (1991); *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 886 (2008);

*Collazo Vázquez v. Huertas Infante,* 171 D.P.R. 84, 102 (2007).[20] Los requisitos para la perfección de un contrato son: (1) consentimiento de los contratantes; (2) objeto cierto, y (3) causa lícita. 31 LPRA sec. 3391; *García Reyes v. Cruz Auto Corp.*, supra, 885; *Rivera v. PRAICO,* 167 DPR 227, 232 (2006). Cuando coexisten estos elementos, un contrato es mandatorio en la manera que se haya celebrado. 31 LPRA sec. 3451.

En nuestro ordenamiento jurídico, impera el principio de libertad de contratación que le permite a las partes pactar las cláusulas y condiciones que entiendan, siempre que estas no sean contrarias a la ley, moral u orden público. *Íd.*, sec. 3372; *Guadalupe Solís v. González Durieux,* 172 DPR 676, 683 (2007); *Álvarez v. Rivera,* 165 DPR 1, 17 (2005); *Torres, Torres v. Torres Serrano,* 179 DPR 481, 493 (2010); *Oriental Finances Services v. Nieves,* 172 DPR 462, 470-471 (2007). Entonces, los contratos "se perfeccionan por el mero consentimiento, y desde entonces obligan, no s[o]lo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". 31 LPRA sec. 3375; *Collazo Vázquez v. Huertas Infante*, supra, pág. 103; *López v. González,* 163 DPR 275, 282 (2004).

A tales efectos, existe un principio conocido como *pacta sunt servanda* o la autonomía de la voluntad que supone la obligatoriedad de lo acordado según sus términos y condiciones. 31 LPRA sec. 2994; *Utility Consulting Services v. San Juan,* 115 DPR 88, 90 (1984); *Banco Popular v. Sucn. Talavera,* 174 DPR 686, 693 (2008). Dicho de otro modo, "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de

---

[20] Nótese que, para esta controversia, es aplicable el Código Civil de 1930 derogado. Debido a esto, procedemos a citar sus artículos pertinentes en derecho.

[estos]". *VDE Corp. v. F & R Contractors*, 180 DPR 21, 34 (2010); *López v. González*, 163 DPR 275, 281 (2004).

Como regla general:

> Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aqu[e]llas.

31 LPRA sec. 3471.

Es decir, la voluntad de las partes tiene más peso que el escrito del contrato cuando este último no es lo suficientemente claro o si no refleja apropiadamente las intenciones de los contratantes.

## C. Compraventa

El derogado Código Civil de Puerto Rico de 1930 dispone en su Artículo 1334 como sigue: "[p]or el contrato de compra y venta uno de los contratantes se obliga entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". 31 LPRA sec. 3741. Así pues, la compraventa ha sido definido como aquel "contrato por el que una parte transmite o se obliga a transmitir la propiedad de un objeto a la otra, a cambio de un precio en dinero". *Segarra Rivera v. Int'l Shipping Agency, Inc*, 208 DPR 964 (2022). Además, el Artículo 1339 del derogado Código Civil consigna que: "[l]a venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, si hubieren convenido en la cosa objeto del contrato, y en el precio, aunque ni la una ni el otro se hayan entregado". 31 LPRA sec. 3746.  No obstante, el contrato de compraventa será válido si cumple con los tres elementos esenciales de los contratos en general, a saber: consentimiento, objeto y causa. *Bco. Popular v. Registrador*, 181 DPR 663, 672 (2011). Se entiende que el consentimiento "se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato". 31 LPRA sec. 1214. Acerca del objeto

en una compraventa, este "puede ser cosas corporales, incorporales o de cosa futura, siempre que recaiga en una cosa determinada en su especie y que se encuentre dentro del comercio de las personas". *Bco. Popular v. Registrador*, supra, pág. 672. Mientras que la causa en la compraventa, por ser un contrato oneroso, se considera que es "la prestación o promesa de una cosa o servicio por la otra parte". 31 LPRA sec. 3431.

**D. Opción de compra**

Según nuestra jurisprudencia, el contrato de opción es aquel "convenio por el cual una parte (llamada concedente, promitente u optatario) concede a la otra (llamada optante), por tiempo fijo y en determinadas condiciones, la facultad, que se deja exclusivamente a su arbitrio, de decidir respecto a la celebración de un contrato principal." *Matos, González v. SLG Rivera-Freytes*, 181 DPR 835, 841 (2011); *P.D.C.M. Assoc. v. Najul Bez*, 174 DPR 716, 724 (2008); *Mayagüez Hilton Corp. v. Betancourt*, 156 DPR 234, 246 (2002). De manera que, el optante tiene la facultad de decidir, a su arbitrio y dentro de un plazo cierto, si ejercerá su derecho de opción. *Íd.* Por ello, "no se opta por optar, sino que la opción es la posibilidad de perfeccionar un contrato previamente delimitado". J. Puig Brutau, *Fundamentos de Derecho Civil, Barcelona*, Ed. Bosch, 1982, T. II, Vol. 2, pág. 50. Mientras que el optatario tiene la obligación de no frustrar la facultad que le asiste al optante. *Matos, González v. SLG Rivera-Freytes*, supra; *P.D.C.M. Assoc. v. Najul Bez*, supra; *Mayagüez Hilton Corp. v. Betancourt*, supra, pág. 50.

Ahora bien, en cuanto al ejercicio de la opción, el Tribunal Supremo explicó como sigue:

> Como norma general, el optante puede ejercer su derecho de opción simplemente notificando al optatario su voluntad de perfeccionar el convenio por el cual optó. […] No obstante, ese derecho queda extinguido con su renuncia, o si transcurre el plazo concedido sin que el optante ejerza la opción, se estima entonces caducado.

De otra parte, si la opción se ejerce dentro del plazo acordado, el contrato de opción queda extinguido y a su vez se perfecciona el contrato aceptado, según haya sido previamente delimitado. Desde entonces, y no antes, las partes están obligadas a satisfacer sus respectivas prestaciones mediante el contrato definitivo.

*Matos, González v. SLG Rivera-Freytes*, supra, pág. 842.

## D. Cláusulas suspensivas

El derogado Código Civil de Puerto Rico de 1930 dispone en su Artículo 1066 reconoce que, como regla general, las obligaciones son exigibles inmediatamente, a saber:

Será exigible desde luego toda obligación cuyo cumplimiento no dependa de un suceso futuro o incierto, o de un suceso pasado, que los interesados ignoren.
También será exigible toda obligación que contenga condición resolutoria, sin perjuicio de los efectos de la resolución.

31 LPRA sec. 3041.

Además, dispone que, a modo de excepción, las partes pueden acordar adquirir o perder derechos, sujeto a la ocurrencia del acontecimiento futuro de un hecho o la llegada de determinado día. *López v. González*, 163 DPR 275, 282 (2004); *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 773 (2001). En consecuencia, nuestro ordenamiento jurídico a reconocido las obligaciones *puras, condicionales y a plazos*, las cuales se definen como siguen:

*Puras* son las exigibles desde el instante mismo de quedar constituida la relación obligatoria; las *condicionales* son aquéllas cuya eficacia depende de un acontecimiento incierto, y *a plazo o a término* las que dejan establecida en firme la prestación sin que pueda exigirse todavía en el momento de quedar constituida la relación obligatoria.

*López v. González*, supra, citando a Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed. rev., Barcelona, Ed. Bosch, T. I, Vol. II, 1985, pág. 81.

A su vez, las obligaciones condicionales tienen la modalidad de aquellas obligaciones sujetas a una condición suspensiva, "cuyo cumplimiento se subordinan los efectos de un acto jurídico por voluntad de los contratantes". *López v. González,* supra. Es decir, "su eficacia depende de que se cumpla un hecho futuro e incierto. Si se cumple esa condición[,] cobra eficacia la obligación; si no se cumple, las parte quedan liberadas." *Jarra Corp. v. Axxis Corp.,*

supra. Lo anterior es reiterado en el Artículo 1070 del derogado Código Civil, a saber: "[l]a condición de que ocurra algún suceso en un tiempo determinado extinguirá la obligación desde que pasare el tiempo, o fuere ya indudable que el acontecimiento no tendrá lugar." 31 LPRA sec. 3045. Nuestra más Alta Curia lo explicó de la manera siguiente: "en el caso de las obligaciones sujetas a una condición suspensiva, se extingue y desaparece el vínculo entre las partes si no cumple dicha condición, y no se pueden exigir las prestaciones hasta tanto ésta se haya cumplido." *Jarra Corp. v. Axxis Corp.,* supra.

Discutido el derecho aplicable, este Tribunal se encuentra en posición para resolver las controversias señaladas en el recurso de epígrafe.

**-III-**

En síntesis, los apelantes alegaron que el foro primario incidió al declarar ha lugar la solicitud de sentencia sumaria presentadas por los apelados. A consecuencia de ello, señalaron que el foro primario cometió dos errores, los cuales discutiremos por separado. No obstante, antes de atender los señalamientos de error, debemos examinar lo siguiente: (i) si las dos solicitudes de sentencia sumaria interpuestas por los apelados cumplieron con los requisitos de forma que exigidos por la Regla 36.3 de Procedimiento Civil, *supra*; y (ii) si existe una controversia de hechos que impida la resolución sumaria y, de responder en la negativa, revisar *de novo* la aplicación del derecho pertinente a la controversia. Veamos.

Al hacerlo así, concluimos que los apelados cumplieron con los requisitos de forma establecidos por nuestras reglas. Observamos que los apelados —tanto en la *Moción de sentencia sumaria* instada por Lifeafar y HDP, como la *Moción de sentencia sumaria parcial* presentada por Turismo— incluyeron una relación enumerada de todos los hechos esenciales y pertinentes sobre los

que alegaron eran incontrovertidos junto a su evidencia en apoyo. De otro lado, el apelante instó su respectivas réplicas y oposiciones a la solicitud de sentencia sumaria, en las cuales mostró su posición sobre cada hecho propuesto por los apelados. Sin embargo, nos percatamos que en algunos hechos adjuntó evidencia documental con el fin de controvertirlos, pero en otros no adjuntó ninguna.

Luego de ejercer nuestra función revisora, advertimos que en el presente litigio no existen controversias de hechos que impidan la resolución sumaria parcial de la controversia. Tampoco encontramos que el foro primario haya errado en la aplicación de la norma jurídica pertinente, de manera tal, que nos sea forzoso revocarle. Consideramos que los fundamentos por lo que alcanzamos esta conclusión están muy bien enunciados en el expediente de epígrafe. Repasemos.

Surge del expediente que, Horned Dorset era la corporación propietaria y encargada de administrar el *Horned Dorset Primavera Hotel* ubicado en Rincón, Puerto Rico. Véase, apéndice suplementario del apelante, anejo XVII, págs. 338-339. Asimismo, se desprende que, Horned Dorset poseía un derecho de usufructo constituido a su favor mediante el Instrumento Público Núm. 37 del 19 de julio de 2005, autorizado por el Notario Rafael Soto Vega. Véase, apéndice del apelante, anejo I, págs. 1-8. Igualmente, consta en el expediente que, Horned Dorset y Lifeafar suscribieron el contrato titulado *Exclusive Right to Purchase Agreement*. Véase, apéndice del apelante, anejo II, págs. 9-21.

En cuanto al precitado acuerdo, los apelantes sostienen que el foro primario incidió al determinar que era un contrato de opción y no de compraventa. No tienen razón.

Conforme al *Exclusive Right to Purchase Agreement,* las partes acordaron que Lifeafar tendría "the sole and exclusive right to purchase, for the period and on the terms set forth herein, from

[Horned Dorsed], all of its assets, including, but not limited to, the *usufructo* right related to the Horned Dorset Primavera Hotel". Véase, apéndice del apelante, anejo II, pág. 9. A su vez, acordaron lo siguiente:

> [...] **The parties shall further formulate and agree to a purchase agreement as soon as reasonably possible** with respect to the Assets. Notwithstanding the pending Deposit and when actually made, the parties acknowledge and agree that this Exclusive Right To Purchase shall be binding on the parties and the rights of exclusivity hereunder shall be applicable from the time of the signing hereof, the parties understanding that **Lifeafar will be relying on such binding commitment and exercising substantial effort and expense to pursue the transactions contemplated herein thus resulting in substantial damages thereto in the event of breach by Seller** of this Exclusive Right to Purchase.
>
> For the avoidance of doubt, the parties agree that as of the signing hereof, **Lifeafar shall have exclusive rights to acquire the Assets, such exclusivity to survive until the date that is <u>75 calendar days</u> following the signing of this Exclusive Right to Purchase and then as extended by the <u>terms of the purchase agreement</u> for the Assets**; and provided, further, that following the date hereof neither PGH nor HDP shall take any action or omit to take any action that would hinder, prevent or delay the Deposit into escrow by Lifeafar.

Véase, apéndice del apelante, anejo II, pág. 10-11.

En cuanto a los términos de adquisición, las partes acordaron el pago de $800,000.00 en efectivo, sujeto a una reducción si Lifeafar decidía pagar deudas y reclamaciones pendientes contra Horned Dorset que ascendieran a $1,000,000. *Íd,* pág. 11. Además, dispusieron que no más tarde de 14 días calendario después de firmarse el acuerdo, Lifeafar debía pagar hasta un máximo de $16,000.00 a la Autoridad de Acueducto y Alcantarillados (en adelante, "AAA"). *Íd.,* pág. 12. De igual forma, las partes pactaron que no más tarde de 30 días calendario después de firmarse el contrato, Lifeafar debía depositar $64,000.00 en una cuenta de depósito como garantía. *Íd.,* pág. 12.

Considerando lo anterior, nos parece meritorio recordar que el contrato de compraventa es aquel acuerdo en el que una parte —llamada vendedor— se obliga a transferir la propiedad de un bien específico a otra parte —llamada comprador— quien se obliga a

pagar un precio cierto. *Segarra Rivera v. Int'l Shipping Agency, Inc,* supra. En cambio, un contrato de opción es aquel en el que una parte —llamada optatario— le concede a otra —llamada optante— un determinado tiempo para ejercer la facultad exclusiva de comprar un bien específico a un precio acordado, a cambio del pago de una prima. *Mayagüez Hilton Corp. v. Betancourt,* supra. De un lado, el optante es la parte que paga una prima por tener ese derecho exclusivo dentro de un término de vencimiento, pero sin obligarse a ejercerlo. Por otro lado, el optatario es la parte que recibe la prima y quien concede la facultad de comprar determinado bien dentro de un plazo acordado y, a su vez, quien se obliga a vender el bien si el optante decide ejerce su derecho. Por lo tanto, en el contrato de opción, el optante tiene un derecho exclusivo y unilateral de decidir si ejercer o no la compra por un precio fijo dentro de un periodo de tiempo acordado, a cambio de un precio cierto.

En el caso ante nuestra consideración, el lenguaje claro del contrato en cuestión nos lleva a concluir que las partes suscribieron un contrato de opción. Nos explicamos.

De acuerdo con el *Exclusive Right to Purchase Agreement,* Lifeafar tenía el derecho exclusivo y unilateral de decidir si compraba o no el *Horned Dorset Primavera Hotel* dentro del plazo de 75 días naturales desde que firmaron el contrato o aquel plazo acordado en el *Purchase Agreement.* Es decir, ausente un *Purchase Agreement* entre las partes, Lifeafar tenía desde el 10 de octubre de 2019 hasta el 24 de diciembre de 2019 para decidir si ejercía o no su derecho. Así pues, las partes acordaron que, dentro de ese período de tiempo, Lifeafar realizaría los esfuerzos y gastos razonables para llevar a cabo la formulación del contrato de compraventa sobre el *Horned Dorset Primavera Hotel.* No obstante, acordaron que Lifeafar ostentaría esa facultad, en la medida que

efectuará el pago de $64,000.00 en concepto de depósito y pagará hasta un máximo de $16,000.00 directamente a AAA.

En el presente caso, nos parece inmeritorio hablar de la existencia de un contrato de compraventa, debido a su naturaleza y las obligaciones que involucra. Según mencionamos, el contrato de compraventa obliga a ambas partes —vendedor y comprador— a realizar la transacción en los términos acordados. Sin embargo, el contrato de opción no obliga a ambas partes a realizar una transacción, sino que confiere a una sola parte la facultad de, a su voluntad, ejercer la transacción en los términos acordados. Así pues, no tenemos duda alguna que el *Exclusive Right to Purchase Agreement* constituyó un contrato de opción por conceder, a saber: (i) la facultad exclusiva y unilateral de perfeccionar un contrato de compraventa, (ii) dentro de un término de 75 días, (iii) por el precio de $800,000.00 y (iv) exigir como depósito el pago $64,000.00. Ante ese escenario, Horned Dorset se comprometió a mantener la oferta de vender el *Horned Dorset Primavera Hotel,* si Lifeafar así lo decidía dentro del plazo y conforme a las condiciones pactadas.

Por lo tanto, concluimos que el foro primario no incidió al determinar que el *Exclusive Right to Purchase Agreement* era un contrato de opción, toda vez que este cuenta con los requisitos exigidos para su validez y eficacia. Recordemos, pues, que rige el principio de *pacta sunt servanda*, siempre que lo acordado no sea contrario a la ley, moral u orden público.

A continuación, atendemos el segundo señalamiento de error de los apelantes. En síntesis, sostienen que el foro primario incidió al determinar que las cláusulas suspensivas del *Release Agreement* le son aplicables a Horned Dorset, aun cuando este último nunca las negoció ni conoció hasta seis (6) meses luego de su efectividad. Esto es, a su entender, el *Release Agreement* fue negociado por Turismo y Lifeafar, por lo cual, este último se subrogó en su lugar y

es quien debe responder por la deuda de impuestos de habitación de hotel vencidos.

Mientras que, Lifeafar y HDP argumentaron que el *Release Agreement* disponía expresamente que el pago de transacción estaba sujeto a la consumación de la compraventa del *Horned Dorset Primavera Hotel*, lo cual podría o no ocurrir. Señalaron que, en la medida que no se consumara la compraventa, Horned Dorset mantendría su obligación frente a Turismo y, este último, estaba facultado para proseguir su reclamación judicial.

De otro lado, Turismo alegó que en el *Release Agreement* se obligó a relevar a Horned Dorset de sus obligaciones, sujeto a dos condiciones suspensivas: (i) el pago de $382,880.00 y (ii) la transferencia del *Horned Dorset Primavera Hotel*. Sostuvo que, toda vez que no había sucedido ninguna de las dos condiciones suspensivas, era indisputable que Horned Dorset debía cumplir con su obligación.

Ahora bien, consta en el expediente que, Turismo instó una demanda contra Horned Dorset —identificada con el alfanúmero RN2019CV00064— para cobrar $1,481,095.45 de impuestos por ocupación de habitación de hotel que nunca fueron remetidos conforme a la Ley Núm. 272-2003, *supra.* Véase, apéndice suplementario del apelante, anejos XVIII al XX, pág. 396. A su vez, surge del expediente que Lifeafar, Turismo y Horned Dorset suscribieron un *Release Agreement* el 28 de abril de 2020. Véase, apéndice del apelante, anejo IV, págs. 25-33. Allí las partes reconocieron que "Lifeafar entered into an option agreemet with Horned Dorset to purchase all of its assets, including all of the assets of Horned Dorset that are used on or related to the operation of the Hotel". *Íd.,* pág. 25. Además, las partes hicieron constar que Turismo reclamaba a Horned Dorset la cantidad de $1,481,095.45 en concepto impuestos correspondiente a las partidas siguientes: (i)

$864,650.57 del principal, (ii) $518,291.88 de intereses y (iii) $98,153.00 por cargos adicionales. *Íd.,* pág. 26. No obstante, las partes pactaron lo siguiente:

1.  In order to facilitate the transaction contemplated in the Option Purchase Agreement, PRTC hereby accepts from Lifeafar, as directed by Horned Dorset pursuant to the terms and conditions of the Option Purchase Agreement, the amount of [...] ($382,800.00), as payment (herein, the "Payment") in full of the Overdue Room Taxes.

2.  The Payment will be made in the following manner: [...] ($76,576.00) on the day of execution of this Agreement to be deposited in a previously approved escrow account fot the exclusive benefit of PRTC (herein, the "Escrow", another [...] ($76,576.00) thirty (30) days after the date of execution of this Agreement to be deposited in the Escrow, and [...] ($229,728.00) to be paid by Lifeafar by manager's check or wire transfer in favor of the PRTC to be delivered to PRTC on the same day that Lifeafar closes on the purchase of Horned Dorset's assets pursuant to the Option Purchase Agreement, which is scheduled to occur no later that Aprill 15, 2020. On the Purchase Closing Date, Lifeafar will cause the funds on deposit in the Escrow to be immediately released to PRTC.

[...]

4.  Until such time that PRTC receives the Payment in full, PRTC will continue to pursue the collection action pending against Horned Dorset and its principals, before the Puerto Ricio Court of First Instance in Aguada, Civil No. RN2019CV00064 (herein, the "Civil Action"). Upon receipt of the Payment in full PRTC will seek voluntary dismissal with prejudice of all claims asserted in the Civil Action.

*Íd.,* págs. 26-28.

Conforme explicamos en el acápite II de esta *Sentencia*, la norma general es que las obligaciones son exigibles inmediatamente. 31 LPRA sec. 3041. No obstante, en virtud de libertad contractual, las partes pueden pactar que las obligaciones sean satisfechas sujeto a que se cumpla un hecho futuro e incierto. *López v. González,* supra. Esto es, la obligación se extingue y desaparece el vínculo entre las partes, si no se cumple esa condición futura. *Jarra Corp. v. Axxis Corp.,* supra. En nuestro ordenamiento jurídico, estas obligaciones son conocidas como las obligaciones sujetas a una condición suspensiva.

En el caso de epígrafe, las partes acordaron de manera expresa que Turismo aceptaría el pago de $382,880.00 por parte de Lifeafar como un saldo de la deuda de Horned Dorset sobre los impuestos de habitación de hotel vencidos. Véase, apéndice del apelante, anejo IV, págs. 26-27. Sin embargo, pactaron que hasta que Turismo no recibiera el pago total acordado por parte de Lifeafar, la deuda completa por concepto de impuestos de habitación vencidos continuaría en pleno vigor y podría continuar la acción de cobro contra Horned Dorset. *Íd.,* pág. 27-28. Ante esto, recordemos que este acuerdo se realizó considerando la existencia del derecho exclusivo a favor de Lifeafar de negociar las deudas de Horned Dorset con el fin de eventualmente poder ejercer la opción y otorgar la compraventa. Es decir, Lifeafar no estaba obligado asumir una deuda o colocarse en el lugar de Horned Dorset, si no ejercía su derecho de adquirir el *Horned Dorset Primera Hotel* dentro del plazo acordado. Así que, Lifeafar tenía la potestad de perfeccionar o no el contrato de compraventa con Horned Dorset y pagar la suma de $382,880.00 a Turismo para satisfacer la deuda de impuestos vencidos. Ello, representaba un hecho futuro e incierto. Por lo tanto, no albergamos dudas, en cuanto a que las partes pactaron una **condición suspensiva** para satisfacer la obligación de Horned Dorset. En la medida en que no ocurrió ni el perfeccionamiento de la compraventa ni se efectuó el pago de $382,880.00, el vínculo entre Lifeafar y Turismo se extinguió, mientras que Horned Dorset mantuvo su obligación frente a Turismo.

Recordemos que tanto Lifeafar, Turismo y Horned Dorset suscribieron los términos y condiciones p lasmados en el *Release Agreement.* Véase, apéndice del apelante, anejo IV, pág. 33. En el referido contrato, Lifeafar fue representada por el Sr. Eric Berman, quien plasmó su firma el 18 de abril de 2020. *Íd.* Mientras, Horned Dorset estuvo representado por el señor Sack mediante su firma

fechada el 18 de abril de 2020. *Íd.* Igualmente, Turismo fue representado por el Sr. Gustavo González con su firma fechada el 28 de abril de 2020. Cada una de las partes tuvieron la potestad de suscribir o no el *Release Agreement*, sin embargo, todas hicieron constar su firma en el contrato manifestando así su consentimiento y conformidad.

Por consiguiente, contemplando que el *Release Agreement* no contraviene la ley ni la moral ni el orden público, incorporamos la determinación del foro primario:

> Con relación al planteamiento de que el *Release Agreement* fue negociado en forma exclusiva entre Lifeafar y la Compañía, sin participación alguna de Horned Dorset ni de sus abogados, el Tribunal sostiene que independientemente de que el *Release Agreement* haya sido negociado entre Lifeafar y la compañía, lo cierto es que Horned Dorset también lo suscribió.

Véase, apéndice del apelante, anejo XV, pág. 292 (énfasis en el original).

Así pues, considerando todo lo anterior, concluimos que el foro primario actuó correctamente al desestimar sumariamente la *Demanda Enmendada*.

**-IV-**

Por los fundamentos previamente expuestos, se **confirma** la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones